**Slip Op. 03-162**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD W. GOLDBERG, SENIOR JUDGE**

|  |  |
|---|---|
| SLATER STEELS CORP., FORT WAYNE SPECIALITY ALLOYS DIVISION; CARPENTER TECHNOLOGY CORP., CRUCIBLE SPECIALTY METALS DIVISION, CRUCIBLE MATERIALS CORP.; ELECTRALLOY CORP.; UNITED STEEL WORKERS OF AMERICA, AFL-CIO/CLC; ACCIAIERIE VALBRUNA S.P.A., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> TRAFILERIE BEDINI, SRL, <br><br> Defendant-Intervenor. | Consolidated Court No. 02-00189 |

[Judgment for defendant in part and remanded to Commerce to clarify why it disallowed the proposed inventory adjustment.]

Date: December 16, 2003

Mary T. Staley (Collier, Shannon & Scott, PLCC) for plaintiffs Slater Steels Corp., Fort Wayne Specialty Alloys Division; Carpenter Technology Corp., Crucible Specialty Metals Division; Crucible Materials Corp.; Electralloy Corp.; United States Steel Workers of America, AFL-CIO/CLC.

Frank H. Morgan, Gregory J. Spak, and Richard J. Burke (White & Case LLP) for plaintiff Acciaierie Valbruna S.p.A.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Patricia McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (James H. Holl, III and Stephen Tosini) for defendant United States.

Thomas Bernard Wilner (Shearman & Sterling) for defendant-intervenor Ugine-Savoie Imphy, S.A.

**GOLDBERG, Senior Judge**:  Plaintiffs challenge the United States Department of Commerce's ("Commerce") determination of antidumping duties in its Notice of Final Determination of Sales at Less Than Fair Value; Stainless Steel Bar from Italy, 67 Fed. Reg. 3155 (Jan. 23, 2002) ("Final Determination").  Originally three separate actions challenging Commerce's Final Determination were filed, and the cases were consolidated by the Court.

## I.  BACKGROUND

In the first original action, plaintiffs Slater Steels Corporation, Fort Wayne Specialty Alloys Division; Carpenter Technology Corporation; Crucible Specialty Metals Division, Crucible Materials Corporation; Electralloy Corporation; and United States Steel Workers of America, AFL-CIO/CLC (collectively, "plaintiffs"), appeal from Commerce's determination that the Italian producer and its French parent, also a producer of stainless steel rod, would not be treated as a single entity.  Plaintiffs also complain that Commerce erred by allowing the Italian producer Trafilerie Bedini, SrL ("Bedini")

to allocate certain United States selling and movement expenses rather than reporting these expenses on a transaction-specific basis.

In the second original action, pre-consolidation Court number 02-00295, Plaintiffs contend that Commerce erred in treating credit expenses for goods on consignment as indirect rather than direct expenses for the Italian producer Acciaierie Valbruna S.p.A. ("Valbruna"). Plaintiffs also claim that Commerce erred by not distinguishing between Valbruna's two levels of trade, retail and wholesale, in the home market.

In the third original action, pre-consolidation Court number 02-00288, Italian stainless steel producer and exporter Valbruna challenges Commerce's determination to impose a 2.5 percent antidumping duty on its imports. Plaintiff Valbruna claims that Commerce erred by "zeroing" the negative dumping margins. Valbruna further claims that Commerce erred in its method of handling depreciation expenses and in disallowing an inventory adjustment.

## II. <u>STANDARD OF REVIEW</u>

The Court will sustain Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §

1516a(b)(1)(B). To determine whether Commerce's construction of the statutes is in accordance with law, the Court looks to Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Under Chevron, it is only if the Court concludes that "Congress either had no intent on the matter, or that Congress's purpose and intent regarding the matter is ultimately unclear," that the Court will defer to Commerce's construction. Timex V.I., Inc. v. United States, 157 F.3d 879, 881 (Fed. Cir. 1998). In addition, "[s]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under Chevron." Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001) (interpreting United States v. Mead, 533 U.S. 218 (2001)). Accordingly, the Court is not to substitute "its own construction of a statutory provision for a reasonable interpretation made by [Commerce]." IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992).

### III. DISCUSSION

### A. Commerce did not Err in Treating Bedini and its Parent Ugine as a Single Entity

Plaintiffs argue that Commerce's refusal to consolidate the data from defendant-intervenor Ugine-Savoie Imphy, S.A. ("Ugine") and its Italian subsidiary Bedini when determining "normal value"

for calculating Ugine's dumping margin is contrary to law. Plaintiffs claim that not consolidating the data across country lines allowed Ugine and Bedini to manipulate the results of the antidumping investigation. Plaintiffs cite Tune Mung Dev. Co. v. United States, 26 CIT __, Slip Op. 02-93 (Aug. 22, 2002) to support their position, which stated that "Commerce has a duty to avoid the evasion of antidumping duties."

Commerce and Ugine correctly argue that consolidating Ugine and Bedini's data across country lines is forbidden in antidumping duty investigations by statute. Except for specific enumerated exceptions to the rule, consolidating investigations and data across country lines for antidumping duty investigations is prohibited.

The dumping margin is the amount that the normal value of the foreign like product subject to the antidumping proceeding exceeds the export price of the subject merchandise. 19 U.S.C. § 1673. The foreign like product is restricted, under any of its definitions in 19 U.S.C. § 1677(16), to identical or similar merchandise that is produced in the same country as the subject merchandise. Congress reinforces its restriction on combining data across country lines in its definition of normal value. "Normal value" is defined in 19 U.S.C. § 1677b(a)(1)(B) as home

market sales of the foreign like product, third country sales of the foreign like product, or constructed value of the subject merchandise.  Under any of these definitions, both the "foreign like product" and the "subject merchandise" must be in the same country as the merchandise that is the subject of the investigation.

Congress has further defined a country in antidumping duty proceedings to be "a foreign country, a political subdivision, dependent territory, or possession of a foreign country."  This definition does not allow for more than two foreign countries to be counted as one, especially in the instance of antidumping duty proceedings.  19 U.S.C. § 1677(3).  In fact, the statute that defines "country" allows that the term "country" may "include an association of 2 or more foreign countries, political subdivisions, dependent territories, or possessions of countries into a customs union outside the United States," "except for the purposes of antidumping proceedings."  Id.  Congress intended to preclude collapsing data and conducting investigations across country lines in antidumping duty proceedings.  Therefore, Commerce did not err in refusing to collapse the data of Ugine and Bedini across country lines.  Because the statute prohibits collapsing the data or the proceedings, Commerce was not

unreasonable in its decision not to collapse the data even though

there was a risk of price or production manipulation by the

affiliated French and Italian companies.  See 19 CFR § 351.401(f)

(two or more affiliated producers shall be treated as one entity

"where those producers have production facilities for similar or

identical products that would not require substantial retooling

of either facility in order to restructure manufacturing

priorities and . . . there is a significant potential for the

manipulation of price or production").

B.    **Commerce's Determination that Bedini Was Allowed to Report
      Certain Sales and Transaction Expenses as Allocated Averages
      Is Supported by Substantial Evidence and in Accordance with
      Law**

Plaintiffs allege that Commerce allowed Bedini to report

certain sales and transaction expenses as allocated averages

rather than providing data on a transaction-specific basis.

Commerce is directed to find that expense allocation is

reasonable when (1) the respondent demonstrates to Commerce's

satisfaction that transaction-specific calculations were not

feasible under the circumstances; and (2) Commerce determines

that the allocation methodologies were not inaccurate or

distortive.  19 C.F.R. §§ 351.401(g)(2), (3).

In light of the facts in this case, Commerce reasonably

agreed with Bedini that it was not feasible to report

transaction-specific calculations. First, Commerce found it too burdensome for Bedini to compile data on a per-transaction basis because Bedini had two fewer weeks to compile data than the other respondents. Second, Bedini was operating on a different computer system that prevented it from reporting data on a per-transaction basis without considerable expense in money and time. Therefore, Commerce was reasonable in finding that section 351.401(g)(2) was satisfied.

Commerce reasonably found that the second element of the regulations (section 351.401(g)(3)), requiring a determination that the allocation methodologies were not inaccurate or distortive, was satisfied. Commerce sampled several individual transactions and found that Bedini's estimates were not distortive, and concluded that Bedini's allocation method was appropriate. To counter this conclusion, plaintiffs present examples of individual transaction expenses that differed greatly from the averages Commerce allowed Bedini to use in calculating normal value. Plaintiffs do not present evidence to show that the method Bedini used was inappropriate; rather, they point to certain instances where individual transactions are very different from the average. For example, plaintiffs point to one transaction where the packing expense per kilogram for an order

was roughly 95 times the average packing expense per kilogram.

However, as both Bedini and Commerce point out, the packing

expense per kilogram for the individual transaction involved the

sale of one kilogram of stainless steel bar, so that the marginal

costs for packing were at an extremely high value.  Plaintiffs

erroneously rely on aberrations that appear in any data set

rather than pointing out any flaws in Bedini's method.

Therefore, Commerce reasonably found that Bedini's allocation

method was neither inaccurate nor distortive.  Commerce's

determination that the expense allocation was reasonable is thus

supported by substantial evidence and in accordance with law.

**C.** **Commerce's Determination that Imputed Interest Expenses Are Indirect Inventory Carrying Costs Seeks No Meaningful Relief and Is Therefore Moot**

Commerce determined that the imputed interest expenses

associated with Valbruna's consignment sales were indirect

inventory carrying costs and not direct selling expenses.

Whether the expenses were indirect or direct depends upon the

consignment merchandise's date of shipment.  Commerce determined

that the date of shipment was the date that the merchandise was

removed from the consignee's inventory, reasoning that Valbruna

maintained the risks and rewards of ownership during that period,

even though the inventory was stored at the consignee's place of

business.  Plaintiffs argue that the date of shipment should have been the date that the merchandise left Valbruna's factory to go to the consignee.  If plaintiffs are correct, then the expenses incurred by Valbruna while the merchandise was stored in the consignee's place of business were direct selling expenses rather than indirect inventory carrying costs.

As Commerce correctly points out, it is unclear what relief plaintiffs are seeking in this claim.  Commerce already took into account the imputed interest expenses when it calculated the constructed export price ("CEP").  19 U.S.C. § 1677a(b).  Double-counting adjustments is prohibited by Commerce's own regulation.  19 C.F.R. § 351.401(b)(2).  Perhaps plaintiffs are asking Commerce to adjust the normal value ("NV") upward to account for circumstances-of-sale adjustments, which include direct expenses.  If plaintiffs are asking Commerce to adjust NV for the imputed interest expense as a direct selling expense, they are asking the impossible.  In this case, adjusting NV for the imputed interest expense would amount to double-counting that expense.  A circumstances-of-sale adjustment cannot be made to the NV because any difference in the circumstances cannot be due to an expense that has already been accounted for in the CEP.  Under either suggested adjustment, plaintiffs are proposing double- or triple-

counting of the imputed interest expense. The double-counting would result in a higher dumping margin because the expense would be counted twice, increasing the NV and decreasing the CEP.

Thus, it is irrelevant to the result of the <u>Final Determination</u> whether the imputed interest expenses are direct selling expenses or indirect inventory carrying costs. Because plaintiffs are not seeking any meaningful relief, the appeal on this issue is moot. Therefore, without directly approving or disapproving of Commerce's categorization of imputed interest expense, the Court upholds Commerce's determination on this issue.[1]

**D.** **Commerce did not Err by Treating Valbruna's Home-Market Sales Through Different Channels as the Same Level of Trade**

Plaintiffs appeal Commerce's determination to treat home-market sales through different channels as the same level of trade. Under 19 U.S.C. § 1677b(a)(1)(B)(i), Commerce must calculate the normal value "to the extent practicable, at the same level of trade as the export price or constructed export

---

[1] Although the issue of whether the imputed interest expenses are indirect or direct is moot because the result is the same, it is worth noting that Commerce's determination is supported by substantial evidence. The facts were uncontested that Valbruna bore the risk of ownership of the merchandise in consignment inventory by retaining title to the merchandise. Therefore, Commerce's determination that the date of shipment was not until the merchandise was used by the customer and was no longer in consignment inventory was in accordance with law.

price[.]"  Accordingly, "sales are made at different levels of trade if they are made at different marketing stages (or their equivalent).  Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing."  19 C.F.R. § 351.412(c)(2).  If Commerce finds that there are two levels of trade, then there will be a level of trade adjustment at some level determined by Commerce.

Valbruna sold its merchandise in Italy through service centers and factories.  Plaintiffs argue that if Commerce had relied upon the empirical data, rather than the self-serving assertions of Valbruna, Commerce would have concluded that there were two levels of trade in the home market.  Plaintiffs produced, both before Commerce and on appeal, empirical evidence demonstrating the different levels of various selling activities between the factories and the service centers.

Commerce argues that it appropriately found there to be one level of trade in the home market after analyzing various categories of selling activities: sales process and marketing support, freight and delivery, inventory and warehousing, and quality assurance/warranty services.  While Commerce noted differences in the inventory and warehousing activities between

the channels of distribution, Commerce determined that the sales process, freight and delivery services, and quality assurance/warranty services activities were similar between the channels of distribution.  Commerce then looked at factors beyond the selling services and found that the sales did not depend on the channel of distribution.  Rather, the differences in sales were due to the geographic location of the customer.  The customers tended to purchase from the supplier that was closest in distance, rather than purchasing products based on the channel of distribution.  Commerce concluded that the two channels of distribution represented the same marketing stages.

Commerce considered the differences in selling activities between the channels of distribution to determine whether there were two levels of trade in the home market, as required by regulation.  See 19 C.F.R. § 351.412(c)(2).  Commerce also considered further empirical and narrative evidence, such as the geographic relationships between the customers and the service centers and factories, in its determination.  Based upon the foregoing, Commerce's determination that there is one level of trade in the home market is supported by substantial evidence and is in accordance with law.

**E.   Commerce did not Err by Zeroing the Negative Dumping Margins**

To calculate the weighted-average dumping margins, Commerce compared the normal value and export value of the stainless steel rod exported by Valbruna. When the normal value exceeded the export value, there was a positive dumping margin. When the export value exceeded the normal value, instead of retaining the resultant negative dumping margin, Commerce assigned a value of "zero" to the dumping margin. This practice is referred to as "zeroing" and has been challenged before in federal court. By zeroing the dumping margin, what Valbruna contends would have been a negative dumping margin became the positive 2.5 percent dumping margin. Valbruna contends that Commerce erred in zeroing the negative dumping margins for three reasons: (1) because zeroing violates the Uruguay Round Agreements Act's requirement of a "fair comparison" of weighted averages; (2) because zeroing violates the World Trade Organization Appellate Body's determination in <u>European Communities – Antidumping Duties on Imports of Cotton-Type Bed Linen from India</u>, WT/DS141/AB/R (Mar. 1, 2001) ("<u>Bed Linen</u>"); and (3) because zeroing is unreasonable.

1. **Commerce's determination to zero the negative dumping margins does not violate the Uruguay Round Agreements Act**

Prior to the Uruguay Round Agreements Act (the "URAA"), 19 U.S.C. § 1677b(a) was silent on the issue of how to compare home

market and United States prices. The 1994 passage of the URAA amended the statute to require that "a fair comparison shall be made between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a). According to the statute, a fair comparison is made "(i) by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise, or (ii) by comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise." 19 U.S.C. § 1677f-1(d)(1)(A). Although prior caselaw has permitted Commerce to zero negative dumping margins, Valbruna argues that under these amendments a "fair comparison" plainly forbids zeroing as both unfair and because the resulting statistic is not a "weighted average."

Valbruna fails to draw the relevant line between the "fair comparison" language of 19 U.S.C. § 1677b(a) and the adjustments to normal value. "Fair comparison" refers to adjustments made to normal value to "adjust for differences between sales that affect price comparability[,]" and is not a separate requirement. Statement of Administrative Action, Pub. L. No. 103-465, 1995 U.S.C.C.A.N. 3773, 4161. The controlling statute is 19 U.S.C. §

1677(35)(B), which directs Commerce to calculate the weighted average dumping margin by considering "the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer." The dumping margin is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise."[2] 19 U.S.C. § 1677(35)(A). As found in <u>Corus Staal BV v. United States Dep't of Commerce</u>, 27 CIT __, 259 F. Supp. 2d 1253 (2003), and <u>Corus Engineering Steels Ltd. v. United States</u>, 27 CIT __, Slip Op. 03-110 (Aug. 27, 2003), the Court finds that Commerce's zeroing methodology is reasonable.

## 2.    Commerce is not bound by the determination of the WTO Appellate Body

Valbruna argues next that the <u>Bed Linen</u> decision by the WTO's Appellate Body prohibits zeroing. This argument is irrelevant. Not only do the WTO's own rules prevent cases from having *stare decisis* effect, but the United States was not a party to <u>Bed Linen</u> and therefore the decision is not binding upon the United States. <u>See also</u> <u>Corus Staal</u>, 27 CIT at __, 259 F.

---

[2]  Contrary to Commerce's assertion, § 1677(35)(A) does not require Commerce to zero negative dumping margins because it defines the dumping margin as the amount by which the normal value <u>exceeds</u> the export price. <u>See</u> <u>Corus Staal BV v. United States Dep't of Commerce</u>, 27 CIT __, 259 F. Supp. 2d 1253 (2003).

Supp. 2d at 1264 (recognizing that <u>Bed Linen</u> has no binding

authority over Commerce).

> **3.** **Commerce's determination to zero the negative dumping margins is in accordance with law**

Valbruna's final argument is that it is unreasonable for

Commerce to zero negative dumping margins in this particular case

because the zeroing changed the dumping margin from a negative

dumping margin to a positive dumping margin that barely exceeds

the *de minimis* level.  It is an unpersuasive argument that the

magnitude of change in the dumping margin necessarily makes the

<u>method</u> of zeroing unreasonable.  Commerce provided a reasonable

basis for zeroing – namely, concerns about masked dumping.  <u>See</u>

<u>also</u> <u>Corus Engineering</u>, 27 CIT at __, Slip Op. 03-110 at 29-30.

The Court finds that Commerce's determination to zero the

negative dumping margin was reasonable.  Therefore, the Court

sustains Commerce's zeroing methodology as applied in this

investigation.

**F.** **<u>Commerce did not Err in Using Revalued Asset Amounts to Calcuate Valbruna's Depreciation Expenses</u>**

Valbruna argues that Commerce erred because it used the

revalued asset amounts rather than the historic net asset values

to calculate depreciation expenses for the cost of production.

The statute requires that the cost of production "shall normally

be calculated based on the records of the exporter or producer of

the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).

To support its claim, Valbruna argues that Commerce should have used the historic net asset value because that was used by Valbruna in its consolidated financial statements and its cost accounting system, and that using the revalued asset amount was distortive and unreasonable. Valbruna also had an unconsolidated financial statement prepared in anticipation of a merger to obtain Italian tax advantages.

Commerce calculated that the depreciation expenses based on the revalued asset amounts because Valbruna's revaluation of its assets were in accordance with Italian GAAP and also because the revalued asset amounts were closer to the assets' appraised values than were the historic net asset values. As noted by Commerce at the administrative level, this practice has been upheld by the Court of International Trade in prior decisions. See Laclede Steel Co. v. United States, 18 CIT 965 (1994); Cinsa S.A. de C.V. v. United States, 21 CIT 341, 966 F. Supp. 1230 (1997). The Court agrees with Commerce that the facts in the

instant case are sufficiently similar to those in the above-cited

cases.  Valbruna fails to demonstrate that Commerce's practice is

unreasonable or that it distorts the depreciation expenses

incurred during the period of investigation.

Accordingly, the Court finds that Commerce's use of revalued

depreciation expenses is supported by substantial evidence and

otherwise in accordance with law.

**G.    Commerce Must Clarify its Decision Not to Make an Inventory
       Adjustment**

In calculating Valbruna's cost of production, Commerce

disallowed an inventory adjustment requested by Valbruna.

Although the sales period of investigation encompassed October

1999 through September 2000, Valbruna requested that Commerce

allow it to report cost information for calendar year 2000.

Commerce granted Valbruna's request.  Because Valbruna's cost

accounting system calculated product-specific, per-unit costs

using the actual quantity of raw materials consumed valued at

future, estimated costs, Valbruna had to make adjustments to its

cost data in its questionnaire responses.  Valbruna did so by

reporting its raw materials costs in the following manner: (1) it

removed the forward, estimated raw materials costs; (2) it

replaced them with the cost of actual purchases of raw materials

during 2000; and (3) it proposed an inventory adjustment in order

to take into account the raw materials in inventory at the beginning of the investigation period.

Valbruna asserts that the inventory adjustment is necessary because, when raw materials are in inventory at the beginning of the period of investigation and are consumed during the period of investigation, a respondent's cost of production must account for the value of the materials that are in inventory at the beginning of the period of investigation. For instance, Commerce stated in Certain Welded Stainless Steel Pipe From the Republic of Korea that "[v]aluing materials based on [the respondent's] purchase price during the POI does not take into account the cost of materials in inventory at the beginning and end of the POI. Therefore, the Department adjusted [the respondent's] submitted material costs to reflect its monthly weighted average value of materials requisitioned from inventory during the POI." 57 Fed. Reg. 53,693, 53,704 (Nov. 12, 1992). Valbruna contends that Commerce should have taken into account the cost of raw materials in inventory at the beginning of the period of investigation in this case, as well.

Commerce responds that, according to the antidumping statute, "[c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such

records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).  Because Valbruna's financial statements were kept in accordance with Italian GAAP and Valbruna did not show that its normal inventory valuation method distorted its costs, Commerce relied upon Valbruna's reported costs to calculate the cost of production.

Commerce further argues that Valbruna was required to show "elements not present in most antidumping determinations" in order to merit a deviation from Commerce's standard costing methodology.  Thai Pineapple Canning Co. v. United States, 273 F.3d 1077, 1084 (Fed. Cir. 2001).  Here, Valbruna did not even cite Thai Pineapple, let alone attempt to show how the present situation is unlike most antidumping determinations.

While Commerce alleges in its brief that its standard costing methodology is to calculate costs based upon purchases of materials made during the period of investigation, Valbruna has pointed to five administrative determinations in which Commerce found that it was appropriate to make an inventory adjustment. See, e.g., Certain Welded Stainless Steel Pipe From the Republic of Korea, Fed. Reg. 53,693, 53,704 (Nov. 12, 1992) (observing

that "[v]aluing materials based on [the respondent's] purchase price during the POI does not take into account the cost of materials in inventory at the beginning and end of the POI. Therefore, the Department adjusted [the respondent's] submitted material costs to reflect its monthly weighted average value of materials requisitioned from inventory during the POI."); Furfuryl Alcohol From Thailand, 60 Fed. Reg. 22,557, 22,560 (May 8, 1995) (stating that "we have recalculated [the] corn cob cost based on the weighted-average cost of corn cob inventories at the beginning of the POI, plus all purchases of the input made during the POI").[3]  Commerce failed even to mention, let alone discuss, these five administrative determinations in both its Issues and Decision Memo and its brief.  Particularly in light of the Federal Circuit's observation in Thai Pineapple that although 19 U.S.C. § 1677b(b)(3) "leaves room for some discretion by Commerce in determining the cost period, the standard methodology may not be permissible in all scenarios because Commerce has recognized that certain circumstances warrant exceptions[,]" the Court remands this issue to Commerce to clarify why it decided not to apply an inventory adjustment to Valbruna's cost of production

---

[3] See also Titanium Sponge From Japan, 55 Fed. Reg. 42,227 (Oct. 18, 1990); Certain Preserved Mushrooms from Indonesia, 63 Fed. Reg. 72,268 (Dec. 31, 1998); Certain Polyester Staple Fiber From the Republic of Korea, 65 Fed. Reg. 16,880 (Mar. 30, 2000).

data akin to the inventory adjustments it made in the five administrative determinations cited above.  Thai Pineapple, 273 F.3d at 1084-85.  If Commerce determines, on remand, that it should have made an inventory adjustment to Valbruna's cost of production data, then Commerce should recalculate Valbruna's dumping margin on the basis of Valbruna's newly-adjusted cost of production data.

## IV. CONCLUSION

For the aforementioned reasons, the Court finds that all challenged aspects of Commerce's Final Determination are supported by substantial evidence and are otherwise in accordance with law, except for Commerce's disallowance of an inventory adjustment.  Accordingly, the Court remands the Final Determination and instructs Commerce to clarify why it decided not to apply an inventory adjustment to Valbruna's cost of production data akin to the inventory adjustments it made in Certain Welded Stainless Steel Pipe From the Republic of Korea, Fed. Reg. 53,693 (Nov. 12, 1992); Furfuryl Alcohol From Thailand, 60 Fed. Reg. 22,557 (May 8, 1995); Titanium Sponge From Japan, 55 Fed. Reg. 42,227 (Oct. 18, 1990); Certain Preserved Mushrooms from Indonesia, 63 Fed. Reg. 72,268 (Dec. 31, 1998); and Certain Polyester Staple Fiber From the Republic of Korea, 65 Fed. Reg.

16,880 (Mar. 30, 2000).  If Commerce determines that it should have made an inventory adjustment to Valbruna's cost of production data, then Commerce should recalculate Valbruna's dumping margin on the basis of Valbruna's newly-adjusted cost of production data.  All other aspects of the <u>Final Determination</u> are sustained.

Commerce is instructed to issue its findings on remand within 90 days of the date of the Order accompanying this Opinion.

**SO ORDERED.**

 

**Richard W. Goldberg**
**Senior Judge**

**Date:    December 16, 2003**
**         New York, New York**

**ERRATUM**

Slater Steels Corp., Fort Wayne Speciality Alloys Division, et al. v. United States, Court No. 02-00189, Slip Op. 03-162, issued December 16, 2003.

• On page 2, insert at the end of the first paragraph: "The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c)."